# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 19, 2024        Decided September 3, 2024

No. 23-7057

MARGDA PIERRE-NOEL, "MS. PIERRE," ON BEHALF OF HER
MINOR CHILD K.N.,
APPELLANT

v.

BRIDGES PUBLIC CHARTER SCHOOL AND DISTRICT OF
COLUMBIA, A MUNICIPAL CORPORATION,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cv-00070)

———

*Charles A. Sibert* argued the cause and filed the briefs for appellant. *Charles Moran* entered an appearance.

*Craig E. Leen* was on the brief for *amicus curiae* Council of Parent Attorneys and Advocates, Inc. in support of appellant.

*Jeremy Girton*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellee District of Columbia. With him on the brief were *Brian L. Schwalb*, Attorney General, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy

Solicitor General, and *Thais-Lyn Trayer*, Deputy Solicitor General.

*Lauren E. Baum* argued the cause and filed the brief for appellee Bridges Public Charter School.

Before: SRINIVASAN, *Chief Judge*, HENDERSON and RAO, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*: Congress enacted the Individuals with Disabilities Education Act to ensure that children with disabilities are not reflexively segregated from their peers at school, or worse, unnecessarily stranded at home. The IDEA offers states and the District of Columbia federal funds in exchange for complying with various statutory requirements. By accepting IDEA funds, a state commits to provide every disabled student a "special education" tailored to her needs, and to ensure that, to the greatest extent possible, she receives that instruction alongside her peers. The IDEA also requires states to provide certain "related services" if necessary to enable a student to "benefit from" her special education. Those "related services" include "transportation" services.

This appeal centrally concerns the extent of "transportation" services that must be provided to K.N., an eight-year-old boy living in the District of Columbia. Due to multiple disabilities, K.N. has limitations in all areas of functioning and depends on a wheelchair and other medical devices. After attending school remotely from home in prior school years, K.N. was set to join his first-grade classmates in person.

To that end, K.N.'s mother, Margda Pierre-Noel, asked the District and his school to help move him from the door of their apartment to the bus that would take him to school. Because K.N. lives in an apartment building that lacks wheelchair accessibility, getting K.N. from his apartment to a vehicle requires transporting him across one or more sets of stairs. The District denied Pierre-Noel's request, citing its policy that District staff retrieve students only from the outermost door of their dwelling (here, the outside door of K.N.'s apartment building), and in no event physically lift or carry students. According to the District, the IDEA's mandate to provide "transportation" services requires nothing more.

The district court granted summary judgment in the District's favor, ruling that the service Pierre-Noel seeks for her son is not a transportation service under the IDEA. We disagree. In our view, the IDEA requires the District to move K.N. between his apartment door and the vehicle that will take him to and from school. Such door-to-door assistance is encompassed by the District's obligation to provide transportation services. And in this case, the District concedes that K.N. would require that assistance to be able to attend school in person and benefit from his special education.

I.

A.

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, "represents an ambitious federal effort to promote the education of handicapped children, and was passed in response to Congress'[s] perception that a majority of handicapped children in the United States 'were either totally excluded from schools or [were] sitting idly in regular classrooms.'" *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982) (second alteration in original) (quoting H.R. Rep.

No. 94-332, at 2 (1975)). To remedy that problem, the IDEA offers states and the District of Columbia federal funds to help educate children with certain physical or intellectual disabilities, and conditions that funding on "compliance with extensive goals and procedures." *Id*.

In accepting IDEA funds, states and the District agree to provide eligible disabled children with a "free appropriate public education," or FAPE. *See* 20 U.S.C. § 1400(d)(1)(A). A FAPE is the IDEA's "core guarantee," *Fry v. Napoleon Cmty. Schs*., 580 U.S. 154, 158 (2017), and provides a disabled child with both a "special education" and the "related services" necessary for her to benefit from that special education, 20 U.S.C. § 1401(9), (26), (29). A student's "special education" is the "instruction" "specially designed . . . to meet [her] unique needs." *Id*. § 1401(29). Such instruction must be provided "at no cost to parents," and it can be "conducted in the classroom, in the home, in hospitals and institutions, and in other settings." *Id*. "Related services" are the "transportation" services and the "developmental, corrective, and other supportive services" that "may be required to assist a child . . . to benefit from [her] special education." *Id*. § 1401(26)(A).

The scope of those related services—and in particular the meaning of "transportation"—is the core issue in this case. The IDEA does not define "transportation," and only defines "developmental, corrective, and other supportive services" through a long parenthetical list of examples. *See id*.; *infra* pp. 15–16.

The provision of a FAPE must be "in conformity with the [child's] individualized education program," or IEP. *Id*. § 1401(9)(D); *see id.* § 1414(d)(2). An IEP "is the means by which special education and related services are tailored to the

unique needs of a particular child." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017) (quotation marks omitted) (quoting *Rowley*, 458 U.S. at 181). An IEP must be in place for each disabled student "[a]t the beginning of each school year," and must outline a comprehensive plan to meet the child's "educational needs." 20 U.S.C. § 1414(d)(1)(A)(i)(II), (d)(2)(A).

Importantly, the IDEA provides that a state is eligible for funding only if, among other things, it has "in effect policies and procedures to ensure that" students are educated in the "[l]east restrictive environment." *Id*. § 1412(a)(5). That means that, "[t]o the maximum extent appropriate," disabled children must be educated alongside their peers and can be removed "from the regular educational environment . . . only when" they cannot be "satisfactorily" educated "in regular classes with the use of supplementary aids and services." *Id*. § 1412(a)(5)(A); *see also* 34 C.F.R. §§ 300.114–300.120.

B.

K.N. is an eight-year-old boy living in the District of Columbia. Due to multiple disabilities, including spastic quadriplegic cerebral palsy, K.N. is nonverbal and faces limitations in all areas of functioning. He depends on a wheelchair to move, a tracheostomy tube to breathe, and a gastronomy tube to eat and take medication because he cannot swallow on his own through his mouth. Considered medically fragile, K.N. requires one-on-one assistance from a nurse, as well as leg and feet braces, elbow and hand splints, a body suit, a pulse oximeter, and a suction machine.

K.N. attended Bridges Public Charter School remotely from home during the 2020–2021 and 2021–2022 school years due to the COVID-19 pandemic and his medical conditions. In May 2022, Pierre-Noel and school staff met and updated K.N's

IEP to provide that he would attend school in person when entering first grade that fall. The IEP established that K.N.'s least restrictive learning environment was specialized instruction with a dedicated nurse aide in school but outside of the general education setting.

Because K.N. would be attending Bridges in person, his IEP specified that he would require transportation in a bus with a dedicated nurse to monitor his medical equipment. Pierre-Noel subsequently requested a nurse and an aide who would help K.N. not just while on the bus, but who could also move him from the door of his apartment to the bus (and vice versa). Doing so would require carrying K.N. up and down one or more sets of stairs: to access K.N.'s non-wheelchair-accessible apartment from the front door of the apartment building, one must climb fourteen steps outside the building and descend six steps inside it; to do so through the back door of the building, one must climb fourteen interior steps. When K.N. was younger, home-care nurses carried him down the back stairs to get him to the school bus, but he is now too heavy for them to lift. As for Pierre-Noel herself, she cannot carry K.N. because of a medical condition, and her husband is not home to carry K.N. on three of five weekdays because of his job responsibilities. According to Pierre-Noel, moreover, K.N. has a tendency to squirm and hyperextend his back when carried outside his wheelchair.

The District's educational agency, the Office of the State Superintendent of Education (OSSE), has assumed the statutory obligation to provide "transportation" services to disabled students in the District. D.C. Code § 38-2907(a). In response to Pierre-Noel's request for assistance with carrying K.N. from their apartment to the bus, an OSSE representative told her that District employees could not enter their apartment building or carry K.N.

The District cited safety concerns and OSSE policy that purports to limit the extent of transportation services the District will provide. That policy states that OSSE bus drivers and attendants "will utilize lifts, ramps, or other mechanized equipment to assist students with wheelchairs," but "are not responsible for providing physical assistance to student passengers" beyond "occasional non-intrusive assistance that does not require lifting or carrying the student." D.C. Off. of the State Superintendent of Educ., Special Education Transportation Policy at 8 (Nov. 6, 2013), https://perma.cc/4H75-RWM8. The District, moreover, maintains that students eligible for school-bus services will only "be picked up from the outermost door of [their] residence," meaning OSSE drivers and attendants will not enter any "apartment buildings, lobbies, entryways or alleys." D.C. Off. of the State Superintendent of Educ., Student Transportation Family Handbook: 2023–24 School Year at 4, 5 (2023), https://perma.cc/GY82-56PG. Although Bridges amended K.N.'s IEP to specify that he needed the services sought by Pierre-Noel, the District maintained its refusal.

Pierre-Noel then pursued administrative relief. As the IDEA prescribes, she filed a complaint with OSSE, and the matter was adjudicated by a hearing officer in what the statute terms a "due process hearing." *See* 20 U.S.C. § 1415(b)(6), (f)(1)(A), (f)(3)(A). Pierre-Noel's complaint charged that the District and Bridges had denied K.N. a FAPE by refusing to transport K.N. pursuant to the transportation accommodations outlined in his amended IEP. The hearing officer concluded it was beyond his authority to order OSSE to transport K.N. as Pierre-Noel requested, but he ordered OSSE to offer K.N. transportation services to and from the outer door of K.N.'s apartment building.

As the IDEA permits, Pierre-Noel brought this suit seeking review of the hearing officer's determination. *See* 20 U.S.C. § 1415(i)(2)(A). She asked the district court to determine that the IDEA requires either Bridges or the District to get K.N. from his apartment door to school and vice versa because doing so is a "transportation" service or a "supportive service" under the statute; to order them to perform that service; and to declare that in refusing to do so, they were denying K.N. a FAPE. *See* Complaint at 24 (J.A. 503); *Pierre-Noel ex rel. K.N. v. Bridges Pub. Charter Sch.*, 660 F. Supp. 3d 29, 32, 37, 44 (D.D.C. 2023). The court held a hearing in which Pierre-Noel presented as a witness the operations officer of a local transportation company. He testified that he was familiar with K.N.'s medical condition and the layout of K.N.'s apartment building, and that his porters could safely transport K.N. between K.N.'s apartment door and a vehicle outside.

The district court held that moving K.N. between the door of his apartment and the bus is neither a "transportation" service nor a "supportive service" under the IDEA. *Pierre-Noel*, 660 F. Supp. 3d at 37–47. The court thus granted the District summary judgment on whether it is obligated to perform the transportation service outlined in K.N.'s amended IEP. *See id*. at 47, 50. Pierre-Noel now appeals.

## II.

Pierre-Noel contends that the IDEA requires either the District or Bridges to move K.N. from the door of his apartment to the school bus and back because doing so (i) is a "transportation" service or "supportive service" and (ii) is "required to assist" K.N. "to benefit from" the "special education" to which he is entitled. *See* 20 U.S.C. § 1401(26)(A). The District disputes that moving K.N. from his apartment to the school bus is a "transportation" service or

"supportive service" under the IDEA. But the District concedes that, if "transportation" service or "supportive service" encompasses the assistance Pierre-Noel requests, that service is "required to assist" K.N. to "benefit from special education" within the meaning of the statute. *Id.*

We conclude that the IDEA's provision for "transportation" service obligates the District to transport K.N. from his apartment door to the school bus. We thus do not address whether that service also qualifies as a "supportive service." Before addressing the merits of the dispute, however, we first explain why this appeal is moot as to Bridges but otherwise remains justiciable.

A.

K.N. is no longer enrolled at Bridges School. Pierre-Noel withdrew K.N. from Bridges at the start of the 2023–2024 school year. Pierre-Noel placed K.N. in a private school for a period of time, but then re-enrolled K.N. in the District of Columbia Public School system. Upon K.N.'s re-enrollment, the District reiterated to Pierre-Noel that it would not transport K.N. from his apartment door to the school bus.

In light of those developments, this appeal is moot as to Bridges. "Under Article III of the Constitution," federal courts have jurisdiction only to "adjudicate actual, *ongoing* controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988) (emphasis added). And there is no ongoing controversy between Bridges and K.N.: he no longer attends that school, and Pierre-Noel has not made any representations that she plans to re-enroll him there.

There remains a justiciable controversy between K.N. and the District, however, because this case presents an issue that is capable of repetition but evading review. That exception to

mootness applies if "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *J.T. v. District of Columbia*, 983 F.3d 516, 523 (D.C. Cir. 2020) (citation omitted). Both conditions are met here.

IDEA cases often satisfy the "evading review" prong because, while they can take years to make their way through the statute's "ponderous" administrative and judicial review process, they typically involve challenges to decisions or IEPs in effect only for a school year or less. *District of Columbia v. Doe*, 611 F.3d 888, 895 (D.C. Cir. 2010) (quoting *Honig*, 484 U.S. at 322); *see, e.g.*, *J.T.*, 983 F.3d at 523–24; *Jenkins v. Squillacote*, 935 F.2d 303, 307–08 (D.C. Cir. 1991). For instance, Pierre-Noel challenges the District's refusal to transport K.N. in the manner she requests, but the specific action she challenges was timebound: it was a refusal to provide the services outlined in K.N.'s amended IEP. *See supra* p. 7. As is typically the case, *see* 20 U.S.C. § 1414(d)(4)(A), (d)(5), that IEP was in effect for the then-upcoming school year but has now been replaced by a new IEP. An IEP-based challenge thus ordinarily cannot "be fully litigated prior to" the IEP's "expiration." *J.T.*, 983 F.3d at 524.

This dispute also satisfies the "capable of repetition" prong. To meet that prong, there must be a "reasonable degree of likelihood" that the complained-of "wrong"—defined "in terms of the legal questions it presents for decision"—"will be the basis of a continuing controversy between the two parties." *Id*. at 524 (citations and brackets omitted). Here, K.N. does not bring a "fact-specific challenge to particular provisions in an inoperative IEP." *Id*. at 519. Instead, he raises a legal question: whether "related services" under the IDEA encompass moving him from his apartment door to the school bus. And it is

reasonably likely that question would be the source of future litigation between the parties: K.N. is re-enrolled in a District public school, the "nature of his disabilit[ies]" means K.N. likely will continue to request the same assistance from the District, and the District presumably will continue to "insist[]" it has no obligation to provide that assistance. *Honig*, 484 U.S. at 318–19. As a result, the legal issue will likely—if not certainly—arise when his new IEP is prepared. *See Jenkins*, 935 F.2d at 308.

For those reasons, while this challenge is moot as to Bridges, it remains justiciable as to the District.

## B.

We turn now to the central question before us: whether the door-to-door assistance Pierre-Noel requests on behalf of K.N. qualifies as a "transportation" service under the IDEA. We conclude that transportation service includes moving K.N. between the door of his apartment and the vehicle that will transport him to and from school.

## 1.

We consider at the outset the extent to which Spending Clause principles of "clear notice" affect our analysis. Those principles, according to the District, mean that the IDEA can be read to encompass moving K.N. from his apartment door to the school bus only if that result is unambiguously clear. We are unpersuaded.

In *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291, 295–96 (2006), the Supreme Court reiterated the implications of the IDEA's status as Spending Clause legislation. Because of that status, the Court explained, states must have "clear notice" of any obligations they incur if

they accept IDEA funds. *Id.* "Unlike ordinary legislation, which imposes congressional policy on regulated parties involuntarily, Spending Clause legislation operates based on consent: in return for federal funds, the recipients agree to comply with federally imposed conditions." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (cleaned up) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16, 17 (1981)). That dynamic means that Spending Clause legislation operates "much in the nature of a contract." *Pennhurst*, 451 U.S. at 17. The "legitimacy" of such legislation "thus rests on whether [a] State voluntarily and knowingly accepts the terms of the 'contract,'" i.e., the enforceable obligations that come with acceptance of federal funds. *Id*. And because states "cannot knowingly accept conditions of which they are unaware or which they are unable to ascertain," any such conditions "must be set out unambiguously." *Murphy*, 548 U.S. at 296 (internal quotation marks and citation omitted).

In light of that clear-notice requirement, the District argues, it would not be enough to conclude that "transportation" is best read to encompass the assistance sought by Pierre-Noel. That argument misconceives the salience of the clear-notice principle in this case. True, the IDEA must make clear to states that they incur an obligation to provide transportation services as a condition of accepting IDEA funds. The precise scope of that obligation, however, need not be spelled out to an extent specifying every factual scenario in which it will apply. *See Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *cf. Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 662, 665–66 (1985); *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649–50 (1999). Rather, for purposes of ascertaining whether a state has "clear notice" that it will incur an obligation if it accepts federal funds,

the "crucial inquiry" is whether "the State could make an informed choice." *Pennhurst*, 451 U.S. at 25.

Here, then, the liability a state must "voluntarily and knowingly" accept, *id.* at 17, is the requirement to provide transportation services; there is no additional requirement that the state know of every scenario encompassed by the obligation. On that understanding, the IDEA supplies ample notice. No one disputes that the requirement to provide "transportation" services to disabled students is an unambiguous condition of receiving IDEA funds: the IDEA conditions a state's funding eligibility on providing a FAPE to "all children with disabilities residing in" its borders, 20 U.S.C. § 1412(a)(1)(A), and the statute defines a FAPE to include "transportation" services, *id*. § 1401(9), (26). That there may be some uncertainty about the extent of the transportation obligation does not bear on whether the District made an "informed choice" to assume it. *See Pennhurst*, 451 U.S. at 25. So, to conclude that the IDEA requires the District to transport K.N. in the door-to-door manner Pierre-Noel requests, we need only apply ordinary tools of statutory construction to determine that the mandate to provide "transportation" services is best read to cover the requested assistance.

2.

When denying the transportation request outlined in K.N.'s amended IEP, the District cited its policy that bus staff cannot go farther than the outermost door of a building and cannot carry students. The IDEA requires nothing more, according to the District, because "transportation" service under the statute "primarily means conveying schoolchildren to and from schools using vehicles like school buses." DC Br. 17; *see also id.* at 21, 25–26. That vehicle-based understanding, to the District, means the IDEA requires it to

provide only vehicular transport (busing) and immediate, vehicle-adjacent assistance (such as "ramps to assist students with disabilities" to board a bus). *Id*. at 2. In the District's view, accordingly, even its policy of helping a disabled student move from the outermost door of his building to the bus (as long as there is no need to carry the student) goes beyond the vehicle-centered duty imposed by the statute. Aside from its claim that "transportation" under the IDEA is vehicle-centric, the District presents no other argument for why "transportation" services would not encompass the door-to-door assistance Pierre-Noel requests.

Under the District's reading, providing "transportation" service for a disabled student to attend school would only include travel in a vehicle and immediate assistance with boarding the vehicle, but would not encompass getting the student to the vehicle from his home. The logic of that position would seem to mean that, in a school district that provides bus service to and from bus stops rather than individual homes, the obligation to provide "transportation" service to a disabled student would include picking her up and dropping her off at a bus stop (and assisting her with getting on and off the bus at the stop), but would not encompass getting her from her home to the bus stop (and vice versa).

The District's interpretation of "transportation" service is unduly narrow. The statute, as noted, does not define the term "transportation." Absent a statutory definition, we typically interpret a statutory term according to its "ordinary, contemporary, common meaning." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014)). While dictionaries can often help identify a term's ordinary meaning, they offer limited assistance here. Dictionaries around the time of the IDEA's enactment in 1975 do not universally indicate that

transportation is confined to the vehicle-based limitation envisioned by the District.

The 1968 version of Black's Law Dictionary defined "transportation" as "[t]he removal of goods or persons from one place to another, by a carrier," *Transportation*, BLACK'S LAW DICTIONARY (4th ed. 1968), but it defined "transport" more broadly as "[t]o carry or convey from one place to another," *Transport*, *id*. The next edition of Black's Law Dictionary, released in 1979, contained the same definition of "transport," but adjusted "transportation" slightly: "The *movement* of goods or persons from one place to another, by a carrier." *Transportation*, BLACK'S LAW DICTIONARY (5th ed. 1979) (emphasis added). Other legal and lay dictionaries from the same period offered similar definitions, suggesting that transportation sometimes—but not always—involves a vehicle or carrier. *See, e.g.*, *Transport*, BALLENTINE'S LAW DICTIONARY (3rd ed. 1969) ("To carry from one place to another. To convey, as by truck, train, ship, wagon, cart, etc."); *Transportation*, *id.* ("The carriage of persons or property from one point to another."); *Transport*, OXFORD AMERICAN HERITAGE DICTIONARY (1976) ("To carry from one place to another; convey."); *Transportation*, *id.* ("The act of transporting."). While the focus on a vehicle is perhaps more pronounced in entries for the noun ("transportation") than the verb ("transport"), that is far from dispositive.

That is especially so because we must consider the term "transportation" not in isolation, but in its context in the statute. The term "transportation" appears in a provision defining the "related services" that a state must provide to disabled students:

> The term 'related services' means transportation, and such developmental, corrective, and other supportive services

(including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education.

20 U.S.C. § 1401(26)(A). In short, states must provide "transportation . . . as may be required to assist a child with a disability to benefit from special education." *Id*.

The IDEA thus does not say states must offer students "transportation," full stop. Instead, the statute obligates states to provide transportation as a related *service* to disabled children to enable them "to benefit from special education." *Id*. And it groups "transportation" services of that kind with "developmental, corrective, and other supportive services." *Id*. The latter—e.g., speech pathology services, counseling, physical therapy—are naturally tailored to a particular child's individual needs. That the statute links transportation with those bespoke services suggests that Congress likewise intended transportation services to be comprehensive and dependent on the unique needs of a specific child. It suggests, then, that the transportation-service obligation can involve the

kind of door-to-door service sought by Pierre-Noel when needed to get a child to the site of her special education.

So, too, does the fact that "transportation" is modified only by the phrase "as may be required to assist a child . . . to benefit from special education." *Id*. Congress could have specified that the transportation obligation is essentially or exclusively vehicular. Congress did exactly that in the Americans with Disabilities Act, which defines "public school transportation" as "transportation by schoolbus vehicles." 42 U.S.C. § 12141(5). That Congress included no such language in the IDEA is notable given that the laws involve closely related contexts. *See Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 279 (2018); *United States v. Ressam*, 553 U.S. 272, 276–77 (2008). Indeed, the Congress that enacted the ADA reauthorized the IDEA a few months later without adjusting the meaning of "transportation" (even as it adjusted the definition of other terms in the IDEA). *See* Americans with Disabilities Act, § 221, Pub. L. No. 101-336, 104 Stat. 327, 339 (1990); Education of the Handicapped Act Amendments of 1990, § 101, Pub. L. No. 101-476, 104 Stat. 1103, 1103; *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987).

In arguing that its transportation-service obligation should be read to contain a vehicular limitation even though the provision nowhere mentions vehicles, the District submits that its obligation cannot mean a "limitless burden of overcoming every obstacle in the student's path, even those created by the family's decision to live in a remote or inaccessible home." DC Br. 27. Whatever may be the extent of the requirement to provide transportation services in circumstances not before us, however, this case involves a child who lives in a walk-up apartment accessible by stairs, an everyday occurrence that hardly would have fallen outside Congress's expectations in enacting the IDEA.

The statutory scheme in fact cuts against any notion that Congress intended the narrow conception of "transportation" pressed by the District. Transportation services enable a disabled child to "benefit from special education," 20 U.S.C. § 1401(26)(A); and the IDEA defines "special education" as "specially designed instruction" ("to meet the unique needs of a child") not just "in the classroom" but also "in the home, in hospitals and institutions, and in other settings," *id.* § 1401(29). In establishing that special education can take place in myriad locations—indeed, in whatever "setting[]" is necessary "to meet the unique needs of [the] child," *id.*—Congress envisioned that, to "benefit from special education," *id.* § 1401(26), a disabled student might need to move between and within multiple sites and kinds of facilities, not all of which will facilitate easy pick up in (and drop off from) a school bus. Much of that varied movement would be left unfacilitated, however, if "transportation" were defined as narrowly as the District urges. If that were so, the scope of the IDEA's transportation-service obligation would stand at odds with the reach of the special-education provision. *Cf. Parker Drilling Mgmt. Servs. v. Newton*, 587 U.S. 601, 608–09 (2019).

The IDEA also mandates that disabled students be educated in the "[l]east restrictive environment." 20 U.S.C. § 1412(a)(5)(A). The statute, as noted, requires states to ensure that:

> [t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of

> supplementary aids and services cannot be achieved satisfactorily.

*Id*. That command to "mainstream" disabled students is a central feature of the IDEA's design. *See Honig*, 484 U.S. at 310–11 & n.1. We cannot assume that Congress desired for disabled students to be educated in their least restrictive learning environment to the maximum extent their abilities permit, *see* 20 U.S.C. § 1412(a)(5)(A), but imposed a limited transportation obligation that would foreseeably leave disabled students without a way to access that very environment.

In that regard, adopting the District's limited conception of "transportation" services would "create some tension with the purposes of the IDEA." *Garrett F.*, 526 U.S. at 77. Congress enacted the IDEA in part to ensure that disabled students previously excluded from the public school system and stranded at home could instead attend school. *See Rowley*, 458 U.S. at 189; *see also* 20 U.S.C. § 1400(c)(2). In particular, the IDEA "makes specific provision for services, like transportation," to "enable a child to be physically present in class." *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 891 (1984). The narrow interpretation of "transportation" urged by the District would leave some disabled children unable to leave their homes and join their classmates in school. K.N. is such a student.

In sum, the IDEA's terms, scheme, and purpose indicate that "transportation" services include the door-to-door assistance sought by Pierre-Noel for K.N. The District's contention that "transportation" connotes only vehicular movement is unpersuasive, and the District offers no other reason to conclude that transportation services exclude what Pierre-Noel requests. The service she seeks—moving K.N. from their apartment to the vehicle that will take him to

school—fits within the scope of transportation services that must be provided to disabled students.

### 3.

As the IDEA contemplates, the Department of Education has issued a regulation interpreting and expounding on the "related services" required by the statute. 20 U.S.C. § 1406(a); 34 C.F.R. § 300.34. The District contends that the Department's regulation contemplates that "transportation" under the IDEA means essentially vehicular travel and immediately adjacent assistance. That contention misses the mark twice over. As an initial matter, the Department's regulations could not narrow the operative meaning of "transportation" envisioned by the statute, *Env't Def. Fund v. EPA*, 922 F.3d 446, 457 (D.C. Cir. 2019), which, as just explained, is broader than the vehicle-centric scope urged by the District. And, regardless, we disagree with the District's interpretation of the relevant regulation.

That regulation generally addresses the scope of "related services" encompassed by the IDEA, and a subsection specifically addressed to transportation provides that "[t]ransportation includes":

> (i) Travel to and from school and between schools;
>
> (ii) Travel in and around school buildings; and
>
> (iii) Specialized equipment (such as special or adapted buses, lifts, and ramps), if required to provide special transportation for a child with a disability.

34 C.F.R. § 300.34(c)(16).

We read that subsection to encompass the kind of service Pierre-Noel requests. Under the first prong, "[t]ravel to and from school" can naturally include something more than just pickup and drop-off at the curb, depending on a child's needs. And the second prong undercuts the District's interpretation that transportation is primarily vehicular: "[t]ravel *in and around* school buildings," *id*. (emphasis added), will often be accomplished through *non*-vehicular means—for example, manually pushing a wheelchair around the school campus.

The Department itself at one time espoused the understanding that the regulation encompasses door-to-door assistance. In 2006, after notice and comment, the Department made various changes to the statute's implementing regulations. Service Obligations Under Special Education, 71 Fed. Reg. 32396 (July 5, 2006). When explaining the changes, the Department noted that some commenters requested that the regulation "explicitly define transportation as door-to-door services, including provisions for an aide to escort the child to and from the bus each day." Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities, 71 Fed. Reg. 46540, 46576 (Aug. 14, 2006). The Department declined to make that change because, in its view, the regulatory definition of transportation already was "sufficiently broad to address" that concern. *See id.*

## C.

Having concluded that the door-to-door assistance Pierre-Noel requests fits within the scope of "transportation" services mandated by the IDEA, we proceed to address two follow-on questions. First, is K.N. in fact entitled to that service because it is "required" for him "to benefit from [his] special education"? 20 U.S.C. § 1401(26)(A). And second, if he is so

entitled, does the obligation to provide the service rest with the District or instead with his school?

The IDEA calls for a state to provide a student with transportation services only to the degree the services "may be required to assist [the] child . . . to benefit from special education." *Id*. Here, the District concedes that the requested service is "required" within the meaning of the statute. While maintaining that it will be appropriate in some cases to inquire into whether the requested service is indeed necessary, the District concedes that, if the assistance K.N. requests is a "transportation" service under the IDEA, then that service is necessary for K.N. to benefit from his special education. We have no occasion to undertake the inquiry in light of the District's concession, and we leave for another day an examination of what a student might need to show to establish she requires the service in question.

Turning to the second question, the obligation to provide the transportation service K.N. requires falls on the District, not his school. Recall that the District has assumed the responsibility to provide IDEA-mandated "transportation" services. D.C. Code §§ 38-2901(12), 38-2907(a). The District contends, however, that it retains discretion to provide statutorily obligated services only to the degree it deems appropriate. That position rests on a misreading of the IDEA's operative provision.

The relevant provision states that, when a "[s]tate educational agency" (here, OSSE) assumes responsibility for "provid[ing] . . . related services directly to children," that

> agency may provide . . . [the] related services . . . in such manner and at such locations . . . as [it] considers appropriate. Such

> education and services *shall be provided in accordance with this subchapter*.

20 U.S.C. § 1413(g)(1), (2) (emphasis added). The District submits that the phrase "as the State educational agency considers appropriate," *id*., means that it need not provide a service if it believes it cannot do so in a way it considers appropriate. That is incorrect. As the language emphasized above confirms, states have some discretion in determining *how* to deliver required services but do not have discretion to decline to provide required services in the first place.

In sum, the IDEA entitles K.N. to be transported from his apartment to the vehicle that will take him to school, and, by assuming the responsibility to provide transportation services under the statute, the District must perform that task. Insofar as the district court on remand determines that injunctive relief is appropriate, we clarify one aspect of our decision. Until now, the parties have suggested that moving K.N. between his apartment and the vehicle would require physically lifting and carrying him. The District, though, could fulfill its statutory obligation in a "manner" it "considers appropriate." 20 U.S.C. § 1413(g)(2); *see, e.g.*, 34 C.F.R. § 300.34(c)(16)(iii) (providing that transportation under the IDEA includes use of "lifts" and "ramps").

\* \* \* \* \*

For the foregoing reasons, we dismiss as moot the appeal with respect to Bridges Public Charter School. We otherwise vacate the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

*So ordered.*